## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| REALTY RESOURCES CHARTERED, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO.  3:08CV586 (MRK) |
| | : | |
| THE HB NITKIN GROUP, ET AL., | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM OF DECISION

In this case, Plaintiff Realty Resources Chartered ("Realty Resources") sues Defendants The HB Nitkin Group, The Innovest Group, Inc., Bradley Nitkin, and HBN Front Street District, Inc. (collectively "HB Nitkin") for breach of contract, unjust enrichment, intentional interference with an advantageous business relationship, fraud, breach of fiduciary duty, and fraudulent conveyance, arising from HB Nitkin's actions in independently pursuing and developing a mixed use real estate project in Hartford, Connecticut. *See* Third Amended Complaint [doc. # 41]. Realty Resources also alleges that HB Nitkin's actions violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a to 42-110q.  On March 13, 2009, HB Nitkin filed a Motion for Summary Judgment [doc. # 51], in which HB Nitkin seeks summary judgment on all counts of the Third Amended Complaint.  At oral argument, the Court granted Realty Resources' oral motion to withdraw its intentional interference with advantageous business relationship and fraudulent conveyance claims.  For the reasons that follow, the Court GRANTS Defendants' Motion for Summary Judgment [doc. # 51] as to Realty Resources' five remaining claims.

### I.

The Court will set forth additional details about the relevant facts and testimony in its discussion of the various claims.  However, as an introduction, the Court provides a brief overview

of the facts, which are relatively straightforward and largely undisputed.

In late 2004, the State of Connecticut's Office of Policy Management ("OPM") solicited developers for a mixed use, residential and retail development project on Front Street in Hartford known as Adriaen's Landing (the "Project").  The Project comprised part of a larger urban development plan that aimed to revitalize downtown Hartford through the construction of a science center, a convention center, hotels, mixed use buildings, and various other components.  OPM, the Capital City Economic Development Authority ("CCEDA"), and Waterford Development LLC, the master developer retained by the State, were responsible for oversight of the Project.  After receiving unsatisfactory responses to a Request for Qualification, the State invited additional developers, including Realty Resources, to submit their qualifications and tour the Project site.

Given Realty Resources' interest in the Project but its relative inexperience in retail development, Realty Resources attempted to partner with another developer, where Realty Resources would complete the residential aspect of the Project and its partner would complete the retail aspect of the Project.  Realty Resources initially partnered with CBL & Associates ("CBL"), and after making presentations to and attending meetings with the State agencies, the State deemed Realty Resources and CBL a qualified developer with whom the State would seek continued discussions regarding the Project.  On March 4, 2005, the State notified Realty Resources and CBL that they had been short-listed for the first phase of the Project, subject to continued negotiations and receipt of a response to a Request for Proposal ("RFP").  However, soon thereafter, CBL decided not to pursue the project, leaving Realty Resources in need of a new retail partner.  As a result of CBL's decision to withdraw from the Project, the State extended Realty Resources' deadline to respond to the RFP from March 14, 2005 to March 25, 2005.

2

On March 14, 2005, Terry Turner, Real Estate Development Manager for Realty Resources, called Bradley Nitkin, President of HB Nitkin, to inquire about collaborating on the Project.  The parties do not dispute that HB Nitkin had no involvement in, and was unaware of, the Project until receiving this call from Mr. Turner.  Following the March 14 telephone call, Realty Resources and HB Nitkin agreed to submit a joint response to the State's RFP in accordance with the March 25, 2005 deadline.  During the two weeks leading up to the RFP submission deadline, HB Nitkin secured an architecture and design team for the Project as well as financing for both the residential and retail aspects of the Project.

On March 25, 2005, the parties submitted their response to the RFP on HB Nitkin stationary "on behalf of a joint venture between The HB Nitkin Group and Realty Resources Chartered."  The response stated that "[t]he Development Team will be a joint venture between The HB Nitkin Group and Realty Resources Chartered.  The HB Nitkin Group will be responsible for the retail and entertainment component of this project and Realty Resources Chartered will be primarily responsible for the residential component."  The response further stated that "[t]he equity component will be provided by The HB Nitkin Group and the debt is expected to be provided by RBS Greenwich Capital Markets and/or their affiliates."  A letter from RBS Greenwich Capital that was included in the response to the RFP stated that it "would provide the HB Nitkin Group with financing necessary to complete up to 400 residential units and 150,000 square feet of retail space as part of the Adriaen's Landing Project."  The response to the RFP designated Robert A.M. Stern Architects as the parties' selected architect.  Realty Resources expressed no objection to the response to the RFP.  To the contrary, Realty Resources represented to HB Nitkin that it was pleased with the parties' submission to the State.

3

On April 11, 2005, Mr. Nitkin and the professional consultants presented the parties' development plan to the State authorities overseeing the Project. At this meeting, Mr. Nitkin discussed the joint venture and the general roles that each of the parties would fill in terms of retail and residential development. Joseph Cloutier, President of Realty Resources, and Mr. Turner also attended this meeting but participated only minimally during the introduction of the Project's team members. Following the presentation, Realty Resources expressed its belief that Mr. Nitkin and the professional consultants had done a "marvelous job" at the presentation. On April 19, 2005, the State informed Realty Resources and HB Nitkin that they had been selected as the preferred developer for the Project and would be asked to proceed with further negotiations with the State. Although the State had selected the parties as the preferred developer, the State made clear that it was under no obligation to award the Project to Realty Resources and HB Nitkin. Upon the State's request for a primary contact person for further communication with the parties, Realty Resources and HB Nitkin agreed that Mr. Nitkin would "take the lead" in responding to the State.

On April 21, 2005, the State held another meeting about the Project. Only Mr. Nitkin attended. According to Realty Resources, this was because it received no notice of the meeting from either the State or HB Nitkin. On April 22, 2005, Mr. Nitkin contacted Mr. Cloutier about the terms of the parties' proposed joint venture and informed Mr. Cloutier that because the Project was presented to the State as a "single integrated project," he had assumed that its financial obligations, subsidies, and benefits would be shared between the retail and residential components of the Project. In addition, according to Realty Resources, Mr. Nitkin indicated for the first time during this call that he understood not only that he was the contact person for the State, but also that HB Nitkin would be the lead developer and in control of the Project. According to Realty Resources, this was

4

the first time that HB Nitkin had ever expressed such an understanding of the Project, which it says the parties had always agreed would involve Realty Resources' control of the residential component and HB Nitkin's control of the retail component of the development.

On April 28, 2005, approximately one month after the parties had submitted their response to the RFP, they again met with the State. At this meeting, the State inquired about the status of the parties' joint venture and reiterated its desire to proceed with a single, integrated developer. On May 3, 2005, the parties met to discuss their inability to agree on the terms of the Project. During this meeting, Mr. Nitkin told Mr. Cloutier of his desire to develop the Project independently from Realty Resources because he was unsure of Realty Resources' possible contribution to the Project and saw no role for it going forward. According to Realty Resources, HB Nitkin offered Realty Resources between $300,000 and $1 million to walk away from the Project. By this time, however, Mr. Cloutier had already decided that he would not pursue a Project with HB Nitkin nor would he seek to work with the State given what he perceived to be a change in the terms of the Project and his concern about the allocation of state and federal subsidies.

On May 6, 2005, the State wrote to Realty Resources and HB Nitkin to inform them that "[t]he search team continues to believe that there are substantial advantages to the State to have a single development entity accept responsibility for both the housing and retail components . . . and [it] therefore intend[s] to negotiate first with a party willing to make that commitment." The State stressed that although it "appreciated [the parties'] efforts to form a joint venture," it now understood that the parties "have been unable to reach agreement on the terms of such a joint venture." As a result, the State asked the parties to notify it no later than May 13, 2005 as to whether either party had the capacity to complete both the residential and retail components of the Project, and if so,

5

whether it was prepared to assume sole responsibility for the Project. The State reminded the parties that the process was one of "competitive negotiation," and reiterated that it had "reserved the right to commence and terminate negotiations with any party at any time and for any reason." The State's letter further stated that "[n]o developer selection will be final, and no commitment made or contract formed, until all material terms are finalized and approved by the Board of Directors of CCEDA and the Secretary of OPM and definitive and binding agreements actually executed."

On May 11, 2005, HB Nitkin responded that it was fully prepared to assume sole responsibility for all aspects of the Project. Conversely, on May 13, 2005, Mr. Cloutier responded that Realty Resources had formed a joint venture with HB Nitkin to gain HB Nitkin's expertise in retail development, and therefore, could not proceed to develop the entire Project on its own. In his letter to the State, Mr. Cloutier stated that "because of the new position that Mr. Nitkin has taken and because of the new position that CEDA has taken, it is impossible for us to go forward."

Following its receipt of the parties' letters, the State selected HB Nitkin to enter into negotiations to develop the Project, and in September 2006, it signed a development agreement with HB Nitkin. In early 2008, HB Nitkin determined that the residential portion of the Project would not be profitable and thus, HB Nitkin proceeded with a retail-only development with the option for residential development at a later date. No decision has been made about whether, when, or even what type of residential development will occur at the Project.

## II.

The summary judgment standard is a familiar one. Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the non-movant.  *See Anderson*, 477 U.S. at 255; *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).  If the moving party carries its burden, the party opposing summary judgment "may not rely merely on allegations or denials." Fed. R. Civ. P. 56(e)(2).  Rather, the opposing party must "set out specific facts showing a genuine issue for trial." *Id.*  In short, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

7

## III.

### A.

Realty Resources' first claim is that HB Nitkin's actions breached the parties' joint venture agreement.  To show a breach of contract under Connecticut law, Realty Resources must establish the following: (1) the parties formed an agreement, (2) Realty Resources performed on the agreement, (3) HB Nitkin breached the agreement, and (4) HB Nitkin's breach was the direct and proximate cause of Realty Resources' (5) damages.  *See McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 503-04 (Conn. App. Ct. 2006), *cert. denied*, 277 Conn. 928 (Conn. 2006).  "To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties."  *L & R Realty v. Connecticut National Bank*, 53 Conn. App. 524, 534 (Conn. App. Ct. 1999) (citations and quotation marks omitted).  "An agreement must be definite and certain as to its terms and requirements. . . . So long as any essential matters are left open for further consideration, the contract is not complete."  *Id.* at 535.  Moreover, the Connecticut Supreme Court has recognized that a joint venture "exists where two or more parties combine their property, money, efforts, skill or knowledge in some common undertaking. . . . The relationship between contracting partes cannot amount to a joint venture unless the parties so intend."  *Doe v. Yale Univ.*, 252 Conn. 641, 672-73 (Conn. 2000).

The Court need look no further than Realty Resources' own testimony and the written record to conclude that these parties, both of whom are sophisticated businesses who had been involved in previous real estate development projects, never formed any agreement, including a joint venture.

8

This is clear not only from the deposition testimony of Mr. Turner, the Realty Resources' manager who had the most initial contact with HB Nitkin, but also from the deposition testimony of Mr. Cloutier, Realty Resources' president.  For example, Mr. Turner's testimony establishes that his initial conversations with HB Nitkin resulted in nothing more than an understanding that Realty Resources would be responsible for the residential component of the Project, and HB Nitkin for the retail component of the Project, and that the parties would have to work out and finalize a written joint venture agreement after submitting their response to the RFP and securing preferred developer status from the State.  Thus, at his deposition, Mr. Turner made the following statements during cross-examination:

> Q:    Did [Bradley Nitkin] say in words or substance that yes, he was agreeable to *forming* a joint venture?
>
> A:    Yes.
>
> Q:    And did you understand him to mean that that would be something that your lawyers would put together at the appropriate time?
>
> A:    Mr. Nitkin told me that *at some point* we would sit down and put the agreement in writing.
>        . . . .
>
> Q:    Did you or he say anything about working out the details of a joint venture?
>
> A:    Mr. Nitkin on a number of occasions said that *at some point* we would memorialize – we would write – we would put our agreement, our understanding in writing.
>        . . . .
>
> Q:    So when he indicated to you that he was, quote, unquote, okay with the arrangement, you took that to mean that he was accepting your proposal?
>
> A:    Yes.
>
> Q.    What exactly did he say to you that led you to believe this?

A:      I'm trying to pin down – it's hard because we had so many conversations about so many things at this point in time.  Part of this was always the separate ownerships, and he was always comfortable with it.

*One of his comments was that we're moving very, very fast and that we need to put things in writing, but we'll have to do that – we'll have to get to that once we get forward with getting our proposal accepted.*
*. . . .*

Q:      So in the second half of March 2005, were you open to the possibility that when these terms were put into writing, that they would change?

A:      Terms can change prior to being signed.  To an agreement being signed.

Aff. of Robert J. Harrington in Accordance with Local R. 56 [doc. # 59] Ex. 2 at 39, 51-53 (emphasis added).  Tellingly, Mr. Turner used the subjunctive tense to describe the parties' efforts, testifying that the parties "would be forming a partnership," not that they "had" formed one.  *See id.* at 99.

Mr. Cloutier similarly testified that the parties merely had an agreement to agree and had not yet entered a formal, written joint venture.  At his deposition, Mr. Cloutier made the following statements during cross-examination:

Q:      [A formal, written joint venture agreement was not yet in place.]  What was in place then?

A:      What was in place was an agreement that we would joint venture the project, we would handle the real estate – the residential piece of it and he'd handle the retail part of it.  That's what was in my mind as our agreement.

Q:      Did that constitute a joint agreement in your mind?

A:      It doesn't constitute a formal signed joint venture agreement, but it constitutes an agreement to go forward with the project to the extent that we did.

Q:      Were there any other elements to the informal agreement that you say was in place?  Other than that Realty Resources would do the residential piece and HB Nitkin Group would do the retail part?

10

A:      No.

*Id.* Ex. 3 at 76-77.   In fact, Mr. Cloutier further testified that the State was correct in its

understanding that the parties were unable to agree on a joint venture:

Q:      And [the State's May 6, 2005 letter] says, "We now understand, however, that you have been unable to reach agreement on the terms of such a joint venture."

[The State] was right about that, right?

A:      [It] was right about that.

Decl. of Jennifer B. Patterson in Supp. of Defs.' Mot. for Summ. J. [doc. # 54] Ex. A at 120.  Indeed,

at oral argument, counsel for Realty Resources acknowledged that the failure to enter into a joint

venture agreement was the product of both parties' inability to get together on its terms.

Thus, whether taken individually or together, Realty Resources' deposition statements belie

any notion that the parties had formed a joint venture.  This is especially so where Realty Resources

could not even cite to another example of a project it had been involved in where there was separate

ownership for retail and residential development – or any kind of commercial and residential

components in the same building – never mind one between experienced real estate developers that

involved such a cursory understanding of the parties' obligations.  *See* Aff. of Robert J. Harrington

[doc. # 59] Ex. 2 at 44.

Despite the testimony of Messrs. Cloutier and Turner as well as the lack of any such project

in its history, Realty Resources persists in claiming that the parties formed a joint venture.  The

Court disagrees.  At best, the parties can be said to have agreed to try to form a joint venture.

However, such an agreement to agree does not give rise to a contractual relationship.  *See, e.g.*,

*Kulick v. City of Hartford*, No. CV065002597, 2007 WL 4707809, at *2 (Conn. Super. Ct. Dec. 10,

2007) ("[T]he parties were unable to 'work out' the terms of the agreement. . . . The general rule is that an agreement to agree is too indefinite to be legally binding when it requires a superseding contract the terms of which must be negotiated."); *Makari v. D&A Realty, LLC*, Nos. CV054004807S & CV054004853S, 2005 WL 895869, at *1 (Conn. Super. Ct. Mar. 14, 2005) (agreements to agree that reflect the parties' intent for a further written contract do not support a breach of contract claim).

The lack of essential terms for the alleged joint venture  further undermines Realty Resources' claim that the parties had reached a joint venture agreement.  The record is clear that the parties failed to agree upon anything other than Realty Resources would be responsible for the residential component of the Project and HB Nitkin would have responsibility for the retail component.  Mr. Cloutier testified as follows when cross-examined at his deposition:

> Q:    Had you ever discussed with Mr. Nitkin or anyone from the HB Nitkin Group about how a project with separate residential and retail ownerships was going to be managed?
>
> A:    Managed?  No, I don't think I did with Brad.  We didn't get past the point of building it.
>
> Q:    Now, it's your position – is it Realty Resources' position that there was an oral joint venture agreement between Realty Resources and the HB Nitkin Group?
>
> A:    Yes.
>
> Q:    Did you ever agree with Mr. Nitkin on what the percentage ownership of this joint venture would be?
>
> A:    Yes.  We would own the residential, and they would own the retail.
>
> Q:    Did you talk about percentages?
>
> A:    No, because it was undecided as to how much residential we were going to build.  And I think it was undecided, as far as I knew, how much retail he

12

was going to build.  So you have to figure out how many units you're going to build, and then you talk about percentages.

Q:      Did you have any discussions with him about what the capital contributions by each party would be?

A:      No, except that I expected we would pay for any common – pro rata share of any common expenses, foundations, professionals, whatever else.  And we would finance the residential.

Q:      Was there any discussion of how it would be determined what the pro rata share for each party would be?

A:      No, because we didn't get that far.  If the residential was going to be 200 units, that's one thing.  If it was going to be 400 units, that's another thing. If Brad was going to build 60,000 square feet, that's one thing.  If he was going to build a hundred, that's another thing.

The fundamental that I was operating under was it was doable; no matter what the final square footage ended up to be, it could have worked.

Q:      Did you ever discuss with Mr. Nitkin what the duration of the joint venture would be?

A:      No.  It's a 99-year lease, so I assumed it would be somewhat less than 99 years.

Q:      Did you ever speak with him about whether either party would be making guarantees?

A:      No.  I expected we would have to have some kind of guarantee, a limited guarantee on the residential.  But I was going to finance the portion or be responsible for the portion of the residential, so it really didn't matter.

Q:      Was there any discussion about who would be responsible for decisions that attended both the residential and retail components?

A:      Brad was going to be the lead developer as far as I was concerned, and we'd have input as to how the project proceeded. . . . .

Q:      You've mentioned several times today that Mr. Nitkin thought that a higher-end tenant should be targeted for the residential than what you thought should be targeted.  Do I have that right?

A:     Yes.

Q:     Was there ever any discussion with him about – let me back up, one more other question.

These were going to be mixed use buildings, correct, with retail and residential together.

A:     Correct.

Q:     So they had to be designed as one unit, correct?

A:     Correct.

Q:     So was there ever any discussion with him about who would make decisions about differences of opinion about the design or the level of and type of tenants that were being targeted?

A:     No.  And again, Brad just had an idea about high-end rentals.  And that was the extent of any discussion.  I had a different idea, and that's why I wanted to commission a market study.

Aff. of Robert J. Harrington [doc. # 59] Ex. 3 at 103-06.  Mr. Turner's testimony also shows the lack of any agreement as to the essential terms of a joint venture, including how it would be managed, what percentage of ownership the parties would have, and how it would be financed.  *See id.* Ex. 2 at 55-68.  Both Mr. Turner and Mr. Cloutier also testified that there was no agreement among the parties regarding the duration of the joint venture.  *See id.* Ex. 2 at 61; Ex. 3 at 104-05.

Furthermore, Realty Resources had never before worked in Connecticut and had no first-hand knowledge of the Hartford residential housing market and the rental prices the area could support.  In fact, at the time the State selected the parties as the preferred developer, it was still undecided how many residential units would be built, partly because the number of parking spaces available for the Project had not been finalized.  As a result, Realty Resources needed to complete a market study analyzing the residential component under varying conditions to determine whether

it would be profitable.  As Mr. Cloutier stated at his deposition, "[m]arket was the thing I was really concerned about."  Aff. of Robert J. Harrington [doc. # 59] Ex.3 at 70; *see id.* at 70-72.  Mr. Cloutier's statement is consistent with his April 22, 2005 email to Mr. Nitkin, in which he stated as follows:

> I get very nervous about committing to build, and I am only speaking on the residential side because that is my experience, when I don't even know the number of units the market will hold or the rent levels.  That to me is the first step.  I have asked Terry [Turner] to get any market studies that have been completed, and we will give them to our residential analyst, but from the rental point of view, we need an independent market study acceptable for us and lending institutions.

Decl. of Jennifer B. Patterson [doc. # 54] Ex. J; *see also id.* Ex. A at 70-72.  However, Realty Resources never commissioned an independent market study.  Therefore, as of the date the State ceased negotiations with the parties, Realty Resources had yet to determine how many residential units would be built, the rental prices the Hartford market could support, and whether the residential component would be profitable.  Given the lack of a market study, Realty Resources never confirmed the profitability of the residential component and thus, whether it would go forward with the joint venture.  *See id.* Ex. A at 84 ("Q: Realty Resources wouldn't build the residential portion of this project if its economic analysis showed that it was going to lose money, would it?  A: That's correct.").

Thus, while Realty Resources may have assumed that the residential component would be profitable and that HB Nitkin would agree to a joint venture in accordance with how Realty Resources understood the Project, the written record makes clear that the parties never reached a mutual understanding about such essential terms as the percentage of ownership, allocation of costs and profits, existence of guarantees, management structure, decision-making responsibility, and duration of the joint venture.  Indeed, the evidence reflects a fundamental disconnect between the

15

parties' understanding of the proposed joint venture.  From the written record, it appears that HB Nitkin foresaw combined capital and financing with the parties' percentage ownership of an LLC created for purposes of the Project, whereas Realty Resources intended separate financing and ownership of the retail and residential components of the Project.  Needless to say, the parties never agreed on anything more than Realty Resources' overall role as the entity responsible for the residential component and HB Nitkin's role as the retail developer.  As such, no contract was formed.  *See Coady v. Martin*, 65 Conn. App. 758, 766-68 (Conn. App. Ct. 2001) (holding that a membership agreement was unenforceable because it failed to delineate the extent of the parties' interests); *L & R Realty*, 53 Conn. App. at 535 (noting that a contract is not complete if any of its essential terms are left open for further consideration).  As HB Nitkin's counsel aptly stated at oral argument, to the extent that the parties agreed on anything, their agreement was akin to two individuals agreeing to build a boat, whereby one individual commits to building the top of the boat, and the other individual commits to building the bottom of the boat.  Yet, here, the parties had not agreed on how large a boat to build, how they would finance the boat-building activity, where one parties' efforts would begin and another's would end, and how they would resolve differences between them.  Dividing the boat between top and bottom does not create a joint venture agreement; at most, it creates an agreement to agree.

Realty Resources also faces substantial obstacles with respect to causation and damages, though those aspects are not necessary to the Court's decision.  The record is clear that as of April 19, 2005, the State had merely chosen the parties as its preferred developer with whom to engage in further negotiations.  It had reserved the right to commence and terminate negotiations with any party at any time and for any reason.  It had no obligation to select either party as the Project's final

16

developer, and it had not entered and executed any binding agreements with the parties.  In fact, Mr.

Cloutier testified as much in his deposition when he stated that although the parties were selected

for further negotiations with the State, their ultimate selection was contingent upon their finalization

of a joint venture agreement:

> Q:  Putting aside the issue of [the allocation of] subsidies for a moment, it's your
> position that once the Selection Committee notified both you and the HB
> Nitkin Group that you had been selected to continue negotiations, that they
> should only have continued with both of you together?
>
> A:  Yes, under the – well, let me back up.
>
> It was up to Brad and I to finalize our understanding together.  They wanted
> that to happen I think.  But when Brad told me he wanted the residential
> subsidies to be used for the retail and Annette [Sanderson from CCEDA]
> backed him up, then there was no way I was going to participate in going
> forward on this project anyway.

Aff. of Robert J. Harrington [doc. # 59] Ex. 3 at 115.

Counsel for Realty Resources essentially conceded at oral argument that it cannot establish

that HB Nitkin was the direct and proximate cause of its damages because as Mr. Cloutier's

testimony makes clear, *both* parties were unable to agree to the terms of a written agreement.

Moreover, the State viewed the parties' written agreement as necessary to proceed with any further

negotiations.  Thus, when a written joint venture agreement failed to materialize, the State informed

the parties that it wanted a single developer who would be responsible for both the residential and

retail components of the Project.  Given that the parties were unable to agree to the terms of their

joint venture agreement, the State subsequently terminated negotiations with the parties as a team,

and Realty Resources decided it would not work with either HB Nitkin or the State.  In those

circumstances, the Court has substantial doubts that HB Nitkin can be said to have directly and

proximately caused Realty Resources' damages.  *See McCann Real Equities Series XXII, LLC*, 93

Conn. App. at 504 ("[C]ausation is an element – and a crucial one – of the plaintiff's prima facie case."); *see also Schietinger v. Southern New England Telephone Co.*, No. X03CV994022075S, 2006 WL 2677825, at *11 (Conn. Super. Ct. Aug. 13, 2006) (discussing proximate cause); *Underkofler v. Cmty. Health Care Plan, Inc.*, No. 3:87-CV-534(EBB), 1999 WL 464530, at *4 (D. Conn. Jun. 17, 1999) (denying breach of contract claim because the defendant's breach did not cause the plaintiff's damages).

Finally, Realty Resources' damages claims are suspect at best, as its counsel conceded at oral argument.   As the Connecticut Supreme Court has explained, "[p]roof of damages should be established with reasonable certainty and not speculatively and problematically. . . . Damages may not be calculated based on a contingency or conjecture." *Leisure Resort Tech., Inc. v. Trading Cove Assocs.*, 277 Conn. 21, 35-36 (Conn. 2006) (rejecting damages as speculative because they were based on contingencies that were unresolved at the time of the alleged breach).   Here, Realty Resources has offered nothing more than speculative damages based on a series of contingencies. First, Realty Resources assumes that the State would have selected the parties as the Project's developer so long as the parties had been able to agree on and finalize a written joint venture. Second, and directly contrary to all record evidence, Realty Resources assumes that the residential component of the Project would have been built and would have been profitable.   Realty Resources makes this gross assumption despite its failure to complete any market studies with respect to the profitability of residential development under varying conditions including, but not limited to, the number of residential units and the rent per unit.   Third, Realty Resources assumes that its applications for state and federal subsidies would have succeeded as to all available subsidies.  And finally, Realty Resources assumes the existence of a developer's fee that was never a part of HB

Nitkin's final agreement with the State.  Given all of the contingencies upon which Realty Resources bases its damages calculation as well as its failure to complete any market studies regarding the number of residential units that the State ultimately contemplated for the Project, it is not surprising that counsel for Realty Resources conceded at oral argument that its damages are "speculative."  *See Bridgeport Harbour Place I, LLC v. Ganim*, No. X06CV040184523S, 2008 WL 366550, at *4 (Conn. Super. Ct. Jan. 25, 2008) ("The deficiency of the plaintiff's claim for lost profits is fundamental.  The plaintiff bases the lost profits claim on a nonexistent construction contract whose potential realization and returns are remote as a matter of law because its evidentiary support is contingent and speculative.").

Thus, the Court finds that Realty Resources' breach of contract claim fails as a matter of law. Realty Resources acknowledged at oral argument that its breach of fiduciary duty claim is dependent on the existence of a joint venture.  *See Electric Assoc., Inc. v. Automatic Equip. Dev. Corp.*, 185 Conn. 31, 35 (1981) ("As a matter of law, parties to joint ventures undertake fiduciary duties to each other concerning matters within the scope of the joint venture."); *see also Coady*, 65 Conn. App. at 764-65.  Accordingly, Realty Resources' breach of fiduciary duty claim fails.  Thus, the Court grants HB Nitkin summary judgment on Counts One (Breach of Contract) and Six (Breach of Fiduciary Duty) of the Third Amended Complaint.

**B.**

Realty Resources also seeks to recover damages under the theory of unjust enrichment. Under Connecticut law, "[u]njust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract."  *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573 (2006).  Unjust enrichment is

19

a form of equitable relief, "its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." *Id.* At oral argument, Realty Resources clarified that it seeks equitable relief from this Court as an alternative to its breach of contract claim should the Court find no joint venture existed. Thus, it has brought what is more accurately described as a *quantum meruit* claim on the basis that Realty Resources and HB Nitkin had an agreement to agree that HB Nitkin disregarded in pursuing the Project. *See Gagne v. Vaccaro*, 255 Conn. 390, 401 (Conn. 2001) ("Quantum meruit is a theory of contract recovery that does not depend upon the existence of a contract, either express or implied in fact.").

As the Connecticut Supreme Court has explained, "quantum meruit arises out of the need to avoid unjust enrichment to a party, even in the absence of an actual agreement. . . . [It] literally means 'as much as he has deserved.' . . . Centered on the prevention of injustice, [it] strikes the appropriate balance by evaluating the equities and guaranteeing that the party who has rendered services receives a reasonable sum for those services." *Id.*; *see also Kopf v. Estate of Kopf*, Nos. CV074006340S, CV074006322S, 2009 WL 1175511, at * 1 (Conn. Super. Ct. Apr. 8, 2009). Although Realty Resources readily admits that quantum meruit is a form of equitable relief that seeks to compensate one party for what another has obtained unjustly, Realty Resources seeks one-hundred percent (100%) of HB Nitkin's yet-to-be realized profits from what is now a retail-only Project. Thus, although Realty Resources would have earned nothing from the retail portion of the Project had it finalized its agreement with HB Nitkin, it now seeks all of the Project's potential profits on the theory that HB Nitkin should not have assumed full responsibility for the Project in response to the State's May 6, 2005 letter calling for a sole developer.

The Court finds Realty Resources' position with respect to HB Nitkin's potential profits

untenable, especially because Realty Resources readily admits that it would have received nothing had the parties gone forward with their joint venture.  Moreover, the record is clear that at the time of the State's May 6, 2005 letter, both parties had an equal opportunity to pursue the Project and Realty Resources decided to forego that opportunity because it did not want to do business with either HB Nitkin or the State.  As such, it voluntarily removed itself from any further consideration for the Project.  Conversely, HB Nitkin responded to the State's invitation to each party, an act that hardly can be said to be unjust since both parties were well aware that the State was in control of the Project and had reserved its right to terminate negotiations with any party at any time and for any reason.  Moreover, although Realty Resources claims that its action in bringing HB Nitkin into the negotiation process benefitted HB Nitkin, it has pointed to no evidence in support of what, if anything, it contributed to HB Nitkin's ultimate success in being awarded the Project.  Nor has Realty Resources shown that HB Nitkin has earned any profit from the Project.  On the basis of the written record, Realty Resources cannot reasonably claim that it deserves all of the profits from a Project in which its only role was calling HB Nitkin's attention to the competitive negotiation process.

Realty Resources also seeks to have HB Nitkin reimburse its Project-related expenses, which it approximates as $50,000.  However, the Connecticut Superior Court stated as follows in a case that also involved the failure of an alleged joint venture concerning possible real estate development:

> Preparation of a response to an RFP is usually undertaken as a speculative venture by the contractors, developers and design professionals involved. . . . [E]ntities that contribute information on pricing and other matters for use in a proposal in a competition of this sort do so without charge with the expectation that they will be hired to perform the work if the proposal is successful.  If it is not successful, those who contributed to putting the proposal together do not look to each other for compensation for the work they have performed but absorb their costs in time and effort as part of the costs of looking for new business.

21

*Patel v. Barot*, No. X01CV960158463S, 2001 WL 1659281, at *5 (Conn. Super. Ct. Nov. 30, 2001). The Court finds that the present situation is analogous.

In responding to the State's RFP, Realty Resources was attempting to secure what it believed would be a profitable residential real estate project.  Given the dual purpose of the Project, the State deemed Realty Resources a qualified developer only because it had found a retail partner in CBL. Similarly, as its request for an extension to the RFP submission date and contact with HB Nitkin reveal, Realty Resources was well aware that it was not a viable competitor for preferred developer status without a retail partner.  Thus, Realty Resources was not rendering a service to HB Nitkin in bringing it into the Project; rather, Realty Resources was attempting to secure preferred developer status and the ability to proceed with further negotiations with the State.  Given that Realty Resources' sole intent was to prevail in the State's process of "competitive negotiation" and secure new business, the Court cannot conclude that justice requires the Court to compensate Realty Resources.  *See Brighenti v. New Britain Shirt Corp.*, 167 Conn. 403, 408 (Conn. 1974) ("[T]he subordinate facts indicate only that the funds were expended voluntarily by the plaintiffs in a calculated business judgment, with its inherent risks, not induced by any conduct of the defendant but in reliance upon a mistaken belief that the parties had executed an enforceable agreement to lease."); *see also Menard v. Gentile*, 7 Conn. App. 211, 216 n.4 (Conn. App. Ct. 1986) (quoting *Brighenti*, 167 Conn. at 407).

In addition, the record is clear that Realty Resources incurred relatively little Project-related expense as of March 14, 2005 because it was more than happy to have HB Nitkin prepare the parties' response to the RFP.  In the ten or so days between Realty Resources' initial contact with HB Nitkin on March 14, 2005 and the RFP submission deadline of March 25, 2005, Realty Resources

participated only minimally in the preparation of the parties' response.  It forwarded HB Nitkin information about its company and staff as well as pro forma financial reports that HB Nitkin deemed unworkable.  However, it was HB Nitkin that identified and secured the professional consultants and financing for the Project, and it was Mr. Nitkin and those consultants that ultimately convinced the State that the parties should be selected as the Project's preferred developer.  In fact, Mr. Turner's own notes from the April 28, 2005 meeting with the State make clear that the parties were chosen because of HB Nitkin's strength as a retail developer.  And as Mr. Turner later stated in an email to Mr. Nitkin after it became apparent that the parties disagreed over the terms of their potential joint venture, "I am perfectly aware that without the time and effort you put into this project we would not have the need for this conversation.  You are also aware that without [Realty Resources] you would not be involved in this project."  Aff. of Robert J. Harrington [doc. # 59] Ex. 32.  It appears to the Court that each party incurred expense in the hope that they would be able to form a joint venture and would be selected to develop the Project by the State.  That did not happen.  But it is not unjust to leave the parties' expenses where they lie.

In sum, the written record is devoid of evidence that supports Realty Resources' claim that HB Nitkin was unjustly enriched by services Realty Resources rendered to it.  Rather, the record shows that Realty Resources acted in its self-interest in inviting HB Nitkin to be its retail partner and moreover, that it played a minimal role in securing the parties' preferred developer status.  Given the complete lack of evidence that Realty Resources expected to be compensated for making HB Nitkin aware of the Project, HB Nitkin need not reimburse it for its Project-related expenses to prevent an injustice.  *See Gagne*, 255 Conn. at 401; *accord Patel*, 2001 WL 1659281, at *5.

Finally, Realty Resources points to HB Nitkin's May 3, 2005 offer to compensate it between

$300,000 and $1 million to walk away from the Project in support of its quantum meruit claim. However, HB Nitkin's offer (assuming it is even admissible under Rule 408 of the *Federal Rules of Evidence*) does not amount to a concession that its conduct in pursuing the Project was unjust. Rather, at the time the offer was made, the parties were working under the assumption that the State wanted to see a written joint venture agreement.  Because the process was one of "competitive negotiation" in which the State had reserved its right to terminate discussions "with any party at any time and for any reason," HB Nitkin could legitimately fear that the parties' failure to timely agree to a joint venture would negatively affect their likelihood of being selected for the Project.  Thus, HB Nitkin may have offered Realty Resources compensation not in acknowledgment that valuable services were rendered but rather as a means of more cleanly terminating the parties' relationship with the State.  However, even if the Court accepts Realty Resources' statement that HB Nitkin's offer was made in acknowledgment of a benefit conferred, given the State's May 6, 2005 letter ceasing its negotiations with the parties and inviting each party to assume full responsibility for the Project, the Court finds no record evidence to support a finding that HB Nitkin's conduct in securing the Project was unjust.

Accordingly, the Court grants HB Nitkin summary judgment on Count Two (Unjust Enrichment) of the Third Amended Complaint.

## C.

Realty Resources also alleges that HB Nitkin made fraudulent statements concerning the parties' joint venture.  To prevail on its claim of fraud, Realty Resources must show that: "(1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other

party relied on the statement to his detriment." *Weinstein v. Weinstein*, 275 Conn. 671, 685 (2005); *see also Flater v. Grace*, 291 Conn. 410, 422 (2009) (citing *Weinstein*, 275 Conn. at 685).  Under Connecticut law, fraud must be proven by clear and convincing evidence. *See Goldstar Med. Servs., Inc. v. Dep't of Soc. Servs.* 288 Conn. 790, 819 (Conn. 2008) (citing *Black v. Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 163 (Conn. 1996)).  At oral argument, Realty Resources stated that its fraud claim is premised on HB Nitkin's allegedly false representation that it intended to enter a joint venture with Realty Resources even though it lacked such any such intent when that statement was made.  The Court finds that Realty Resources' claim fails for multiple reasons.

First, HB Nitkin's statement of its intent to agree to a joint venture is not actionable as a false representation made as a statement of fact.  *See Building Traditions, LLC v. Panek*, No. CV010811412S, 2005 WL 1023148, at *15 (Conn. Super. Mar. 23, 2005) ("[A] promise to promise or an agreement to agree in the future is neither an enforceable contract nor an actionable misrepresentation of a present fact.").

Second, even if HB Nitkin's stated intention could constitute a false representation of fact, Realty Resources has not offered any evidence in support of the conclusion that HB Nitkin's statement was untrue and known to be so when made.  At oral argument, Realty Resources argued that two pieces of evidence show that HB Nitkin falsely stated that it intended to agree to a joint venture: (1) after the parties' April 11, 2005 presentation to the State, HB Nitkin hired a private investigator to research Realty Resources in Maine; and (2) HB Nitkin failed to inform Realty Resources of an April 21, 2005 meeting with the State.  However, contrary to Realty Resources' contention, neither of these facts supports the conclusion that HB Nitkin's representation that it intended to enter a joint venture with Realty Resources was fraudulently made.

Realty Resources argues that HB Nitkin's decision to hire a private investigator after the April 11, 2005 presentation to the State but before the Project was awarded, demonstrates that it never intended to enter a joint venture with Realty Resources. However, the April 15, 2005 service agreement between All Phase Investigations (API) and HB Nitkin states that HB Nitkin requested that API confirm that Mr. Cloutier was an attorney in good standing in Rockport, Maine and that Realty Resources was doing business from 247 Commercial Street in Rockport, Maine and appeared to be managing 2,000 residential units. As such, HB Nitkin merely appeared to have been attempting to corroborate the information provided to it by Realty Resources since HB Nitkin had never before done business with Mr. Cloutier or Realty Resources and since HB Nitkin had attempted unsuccessfully to coordinate an in-person meeting between the parties at Realty Resources' headquarters. In addition, the email from the API investigator to HB Nitkin regarding API's investigation stated that Realty Resources' businesses were legitimate and well-kept and that HB Nitkin should now have a good idea of Mr. Cloutier and his company.

The day after he received this email from API, Mr. Nitkin contacted Mr. Cloutier to inform him that the State wanted confirmation that the parties had worked out their joint venture agreement. In addition, he sought to clarify Realty Resources' expectations as to its financial contributions, its willingness to sign personal guarantees, and its percentage ownership of the Project. Furthermore, Mr. Nitkin invited Mr. Cloutier to visit HB Nitkin's office in Greenwich, Connecticut, and Mr. Nitkin expressed his desire to travel to Maine to meet Realty Resources' staff. Contrary to Realty Resources' assertions, the record evidence concerning the API investigation does not support a finding that HB Nitkin fraudulently misrepresented its intent to enter a joint venture with Realty Resources. At best, the evidence demonstrates that HB Nitkin felt that the April 11, 2005

presentation to the State went well, and that, as a result, the company wanted to confirm the credentials of its potential business partner.

Realty Resources also points to HB Nitkin's failure to inform it of the April 21, 2005 meeting with the State in support of its fraud claim. Realty Resources maintains that this is further evidence that HB Nitkin fraudulently misrepresented its intent to enter a joint venture because it was pursuing contacts with the State to the detriment of Realty Resources. However, nothing in the record supports Realty Resources' supposition that HB Nitkin intentionally excluded it from this meeting with the State in an effort to undermine the potential joint venture. Instead, the only evidence in the record concerning the April 21, 2005 meeting are Mr. Nitkin's statements that he had assumed the State had informed both parties of the April 21, 2005 meeting when its representative had called to inform each of the companies that they had been selected as the preferred developer for the Project. As a result, Mr. Nitkin stated that he was surprised to arrive for the meeting only to find that no one from Realty Resources was present. In addition, Mr. Nitkin stated that the meeting was rather cursory and addressed "ordinary things" such as the names of contact persons at the various State agencies, ethical issues to be aware of, and whether the parties had reached a joint venture agreement. So far as Mr. Nitkin could recall, the meeting involved no discussion of the allocation of grants and subsidies between the residential and retail components of the Project. Realty Resources has offered no evidence to contradict Mr. Nitkin's testimony. In addition, Realty Resources chose not to depose any State representatives in attendance at the meeting to determine whether Mr. Nitkin accurately conveyed the substance of the April 21, 2005 meeting.

Thus, the Court concludes that no reasonable juror could find on the basis of the evidence presented that HB Nitkin fraudulently misrepresented its intent to enter a joint venture agreement

with Realty Resources.  The Court further notes that Realty Resources' fraud claim also is undermined by the lack of any evidence to support the conclusion that HB Nitkin misrepresented its intent to joint venture the Project for the purpose of inducing Realty Resources' reliance.  For example, there is nothing in the record to indicate that Realty Resources had identified and was considering other retail partners with whom to respond to the State's March 25, 2005 deadline and that HB Nitkin misrepresented its intent to ensure that Realty Resources invited it to be its retail partner for purposes of responding to the RFP.  Because Realty Resources has not offered sufficient evidence to establish a cause of action for fraud, the Court finds that its claim fails as a matter of law.

As Realty Resources acknowledged at oral argument, its CUTPA claim is dependent on the success of its fraud claim.  *See Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 217-18 (Conn. 2008) (noting that a plaintiff must show that the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce to prevail on a CUTPA claim). Accordingly, Realty Resources' CUTPA claim fails.  Thus, the Court grants HB Nitkin summary judgment on Counts Four (Fraud) and Five (CUTPA) of the Third Amended Complaint.

## IV.

Therefore, the Court GRANTS Defendants' Motion for Summary Judgment [doc. # 51]. **The Clerk is directed to enter judgment in favor of Defendants and close this file.**

IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge


**Dated at New Haven, Connecticut: July 24, 2009.**